**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL WITHERSPOON,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **06 C 7089** |
| | ) | |
| **v.** | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| | ) | |
| **CITY OF WAUKEGAN,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael Witherspoon sued the City of Waukegan for race discrimination and retaliation

in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

*et seq.* A jury returned a verdict in favor of defendant on Witherspoon's discrimination claim

and in favor of Witherspoon on his retaliation claim and awarded him $10,000.00 in

compensatory damages. Before the Court is defendant's renewed motion for judgment as a

matter of law as to plaintiff's retaliation claim. For the reasons provided in this Memorandum

Opinion and Order, the Court denies the motion.


**Background**

In October 2000, the City of Waukegan hired plaintiff, an African-American, as a

Maintenance Worker I. (Trial Tr. vol.1, 22, 32, June 22, 2010.) In this position, he was in

charge of the plumbing, heating and cooling systems in the City's downtown buildings and

supervising custodians. (*Id.* 22.) In March 2005, plaintiff was denied a promotion as Building

Maintenance Supervisor, and the job was instead given to Bruce Kennedy, who is Caucasian.

(*Id.* 54-56.) Thereafter, on March 31, 2005, Witherspoon filed an American Federation of State, County, and Municipal Employees ("AFSCME") official grievance form alleging race discrimination; specifically that the City had a policy of not promoting African-Americans to supervisory positions. (*Id.* 57-58.)

Shortly thereafter, plaintiff took a leave of absence to have knee surgery and returned to work without physical restrictions on June 6, 2005. (*Id.* 66-68.) On June 15, 2005, the Director of Public Works William ("Biddy") Johnston and Safety Officer Larry Matson, among others, held a meeting with plaintiff about his grievance. (*Id.* 62.) At the meeting, plaintiff was told that one of the reasons he did not receive the promotion was because of his job performance. (Trial Tr. vol. 2, 148-50, June 23, 2010.) Thereafter, for various reasons explained below, plaintiff felt like he was being retaliated against at work for filing the AFSCME grievance. (Trial Tr. vol. 1, 69.)

Consequently, on July 27, 2005 plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that the City discriminated and retaliated against him on the basis of race. (*Id.* 69.) Specifically, Witherspoon believes he suffered the following in retaliation for filing the AFSCME grievance, or the EEOC charge or both:

### A. Uniform

First, on June 10, 2005, plaintiff testified that he received a memorandum on his time card stating that all non-supervisory employees were required to wear a uniform. (*Id.* 64.) The memorandum was from Biddy Johnston to Bruce Kennedy. (*Id.*) Although the memorandum referred to all employees, plaintiff felt it was intended for him because it was allegedly posted on his time card. (*Id.*) Plaintiff was never required to wear a uniform and thought that the memorandum was another incident of retaliation for filing a grievance. (*Id.*) At the time he

received the memorandum, however, plaintiff was wearing a uniform he had been assigned a month earlier.  (*Id.* 65.)

**B.  Menial tasks**

Second, Witherspoon testified that after he returned from knee surgery his supervisor Bruce Kennedy gave him menial tasks to perform.  (*Id.* 59.)  Specifically, the only menial task plaintiff testified about was changing light bulbs.  (*Id.*)  Plaintiff also testified that Kennedy knew about his AFSCME grievance.  (*Id.* 59-61.)

**C.  Commercial Driver's License**

Third, on August 12, 2005, plaintiff received a memorandum from Johnston stating that he was required to obtain a commercial driver's license ("CDL") by September 13, 2005.  (*Id.* 66-68.)  Although it is undisputed that Maintenance Worker I's are required to have a CDL, plaintiff testified that when he was hired no one ever asked him if he had one or told him that he was required to get one until five years after he was hired.  (*Id.*)  Plaintiff also testified that he thought it would take six months to obtain a CDL, and that he did not think it was possible to obtain it in a month.  (Trial Tr. vol. 2, 158, 161.)  Matson testified that he did not realize plaintiff did not have a CDL until he was reviewing plaintiff's grievance, shortly after he had compiled a list of employees with CDLs for random drug testing, which he was required to do by the U.S. Department of Transportation, and noticed plaintiff's name was not on the list.  (Trial Tr. vol. 3, 456, June 24, 2010.)

**D.  Alleged Termination**

Last, on August 16, 2005, plaintiff returned from a doctor's appointment with a physician's note.  (Trial Tr. vol. 2, 70.)  The note stated:  "May return to work with restrictions-no aggressive squatting, running, or standing.  May perform light work.  No lifting over 20 lbs."

(Joint Trial Ex. 10, Physician's Note, August 16, 2005.)  Plaintiff testified that he gave the note to his "work center supervisor," whom he saw discuss the note with Larry Matson, and plaintiff went back to work.  (Trial Tr. vol. 1, 70.)

Plaintiff returned to work on August 17, 2005 with a knee brace and the same physician's note.  (*Id.* 71.)  After seeing the note, Larry Matson told plaintiff to go home without an explanation.  (*Id.*)  On September 20, 2005, plaintiff received a letter from the City of Waukegan.  (Trial Tr. vol. 2, 82.)  The letter stated that plaintiff's department at the City of Waukegan did not have light-duty positions or a light-duty policy and that they looked forward to his return once he recovered.  (*Id.*)  On October 25, 2005, plaintiff filed a second charge with the EEOC alleging that defendant retaliated against him in violation of Title VII when he was told to obtain a CDL within a month's time and when he was sent home without explanation on August 17, 2005.  (*Id.* 88.)

## Discussion

When ruling on a motion for judgment as a matter of law, the court does not reweigh the evidence presented at trial or make credibility determinations; instead, the court reviews the evidence making all reasonable inferences in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).  Ultimately, the question the court must decide is whether the jury was presented with a "legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000).  Although a legally sufficient amount of evidence need not be overwhelming it must be more than a "mere scintilla." *Id.* ("[T]his is fundamentally the same standard that we use . . . on summary judgment, with the important

difference that we now know exactly what evidence was put before the jury.").  As the Seventh Circuit has reiterated, "overturning a jury verdict is not something [the court] do[es] lightly." *Id.* at 925 (citation omitted).

At this juncture (after a Title VII trial on the merits), the only relevant legal inquiry that the Court must determine is whether plaintiff presented sufficient evidence to allow a rational jury to find that he was a victim of retaliation. *Diettrich v. Nw. Airlines, Inc.*, 168 F.3d 961, 965 (7th Cir. 1999); *see also David v. Caterpillar, Inc.*, 324 F.3d 851, 858 (7th Cir. 2003). Notwithstanding this well established standard, defendant argues that the legal issue here is whether plaintiff established a *prima facie* case under the *McDonnell Douglas* burden-shifting apparatus.  *See* Def.'s Renewed Mot. at 2 (arguing that plaintiff failed to established that he was treated less favorably than similarly situated employees who did not engage in protected activity).  As the Court has already explained to defendant, and as the Supreme Court has held, this burden-shifting apparatus applies to pretrial proceedings, not to the jury's evaluation of the evidence at trial.  *See U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714-15 (1983); *see, e.g.*, *Hall v. Gary Cmty. Sch. Corp.*, 298 F.3d 672, 675 (7th Cir. 2002) (*McDonnell Douglas* framework is unnecessary when reviewing judgments as a matter of law); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1174 (7th Cir. 2002) (once a trial is complete, "the burden-shifting framework of *McDonnell Douglas* falls away"); *Massey*, 226 F.3d at 925 (after trial "we need not tarry on the to's and fro's" of the *McDonnell Douglas* framework).  Once the judge finds that the plaintiff has made the minimum necessary demonstration (*prima facie* case) and that the defendant has produced a legitimate, non-discriminatory explanation, "the burden-shifting apparatus has served its purpose, and the only remaining question-the only question the jury need answer-is whether

the plaintiff is a victim of [retaliation]." *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir.

1994).

### A.     Plaintiff's Retaliation Claim

Defendant devotes a majority of its brief arguing that plaintiff did not prove his

retaliation claim because there was insufficient evidence that he suffered an adverse employment

action.  Defendant made this argument in its motion for summary judgment, which the Court

denied because there were genuine issues of material fact as to plaintiff's retaliation claim

(including whether he suffered a material adverse employment action).  *See Lewis v. City of Chi.*

*Police Dep't*, 590 F.3d 427, 436 (7th Cir. 2009) (explaining that whether something is a material

adverse employment action is sometimes a question of law, and other times a question of fact)

(citing Seventh Circuit Pattern Jury Instruction § 3.01, Comment E, which notes that if a fact

issue arises as to whether the plaintiff suffered a materially adverse employment action, "a court

should modify the instructions to provide the jury with guidance as to what this term means").

Yet at trial, defendant did not argue to the jury that plaintiff had not suffered an adverse

employment action.  Rather, defendant made it clear at trial that its defense was it did not require

plaintiff to wear a uniform, perform menial tasks, obtain a CDL, or go home in retaliation for

complaining; not that defendant had not suffered an adverse employment action.  Nor did

defendant propose a jury instruction requiring such a finding or object to the jury instruction

given, which did not require such a finding.  *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381

F.3d 717, 733 (7th Cir. 2004) (holding that defendant waived its argument by failing to propose

a jury instruction requiring such a finding by the jury or by not objecting to the court's

instruction).  Consistent with how defendant defended the case at trial, and without objection, the

jury was instructed as follows:

Plaintiff claims that because he complained about being a victim of discrimination defendant terminated him or changed his working conditions in one or more of the following ways:

> -sending Plaintiff home on August 17, 2005;
> -assigning Plaintiff menial tasks
> -making Plaintiff wear a uniform;
> -requiring plaintiff to obtain a commercial driver's license ("CDL")

To succeed on his claim, Plaintiff must provide by a preponderance of the evidence that Defendant did one or more of the above-described retaliatory actions because he complained about being a victim of discrimination. Your determination as to any one such action must be unanimous. To determine that Defendant did any one or more of the above-described retaliatory actions because Plaintiff complained about being a victim of discrimination, you must decide that Defendant would not have done any one or more of the above-described acts if Plaintiff had not complained about being a victim of discrimination and everything else had been the same.

(Jury Instructions, *Witherspoon v. City of Waukegan*, No. 06-CV-7089, ECF No. 180.) By failing to object to the jury instruction given on retaliation or proposing that this issue go to the jury, the Court finds that defendant has waived the argument that plaintiff did not suffer an adverse employment action. *See Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 406 (7th Cir. 2010) (holding that defendant waived its argument as to whether plaintiff suffered an adverse employment action where defendant did not argue the issue to the jury, failed to argue the issue in its pre-verdict motion for JMOL, and did not request a jury instruction on the issue).

Moreover, defendant also waived this argument in its post-judgment motion for judgment as a matter of law ("Rule 50(b) motion") by failing to raise it in its pre-verdict motion for judgment as a matter of law ("Rule 50(a) motion"). (Trial Tr. vol. 3, 370-73.) Defendant's Rule 50(b) motion is a renewal of its pre-verdict motion, and can be granted only on grounds advanced in its pre-verdict motion.[1] *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010).

---

[1] Although this issue was not raised by the parties, the Court may raise it *sua sponte*. *See Funk v. F & K Supply, Inc.*, 43 F. Supp. 2d 205, 223 (N.D.N.Y. 1999).

Consequently, for the following reasons, the Court declines to set aside the jury verdict on the issue of whether plaintiff suffered an adverse employment action.

Moreover, the Court finds that in viewing the evidence in the light most favorable to plaintiff there was sufficient evidence for a reasonable jury to find that plaintiff was assigned menial tasks, required to wear a uniform, required to obtain a CDL or sent home on August 17, 2005 in retaliation for complaining about discrimination. For instance, plaintiff presented sufficient evidence that a rational jury could have found that defendant required plaintiff to obtain a CDL in retaliation. Plaintiff presented evidence that on August 12, 2005, about two weeks after he filed his EEOC charge and about five years after he had been hired, plaintiff received a memorandum from Johnston stating that he was required to obtain a CDL by September 13, 2005. (Trial Tr. vol. 1, 66-68.) Plaintiff testified that when he was hired he was neither asked if he had a CDL, nor told to obtain one. (Trial Tr. vol. 1, 25-26.) Plaintiff also testified that he thought it would take six months to obtain the CDL, and that he did not think it was possible to obtain it in a month. (Trial Tr. vol. 2, 158, 161.)

In response to plaintiff's argument that he was asked to obtain a CDL in retaliation, defendant offered the jury one nondiscriminatory reason—that Larry Matson did not realize until after defendant filed a grievance that plaintiff did not have his CDL. Specifically, Matson testified that he did not realize plaintiff did not have a CDL until he reviewed plaintiff's grievance, shortly after compiling a list of employees with CDLs for random drug testing in 2005, which he was required to do by the U.S. Department of Transportation. (Trial Tr. vol. 3, 456.) Specifically, Matson said:

> I was reviewing one of the -- I think it was a grievance, and I noticed that Michael was a maintenance employee. And this was shortly after I prepared the commercial driver's license random drug testing list. And I made a check of it and noticed that Michael's name was not on that list.

(*Id.*)  Matson spoke with Biddy Johnston about Witherspoon not having a CDL.  (*Id.*)

Thereafter, Biddy asked Matson to hand deliver the CDL memorandum to plaintiff.  (*Id.*)  On the

same day he hand delivered the memo, Matson also sent plaintiff a copy through interoffice

mail.  (*Id.*; Trial Tr. vol. 4, 518, June 25, 2010.)

      Johnston, who was the subject of plaintiff's discrimination claim as he was the one who

denied plaintiff the promotion, testified that he asked plaintiff to obtain a CDL:

> Because that job classification, you're required six months prior -- after your start
> of employment to have a CDL license.  He had been there eight years and I didn't
> -- because he was at City Hall, I didn't know he didn't have it until I went through
> -- I was -- we were checking everybody's license at the facility, which we did
> periodically."

(Trial Tr. vol. 4, 546.)  Then, on cross examination, Johnston testified as follows:

> Q.  And -- well, you knew that Mr. Witherspoon didn't have one obviously from
> that memo, right?
> A.  At that -- from this time, yes.
> Q.  And that's because –
> A.  Well, previous to that I did not.
> Q.  And that's because Larry Matson found out and told you; is that correct?
> A.  No, I believe Steve Drew might have been the one that found out when he
> checked the driver's license, but I'm not sure.  It could have been Matson too.
> Q.  Matson brought it to your attention?
> A.  Possibly.  I don't remember.
> Q.  Well, wasn't that his responsibility as a safety officer, to do that?
> A.  It would be part of his scheme, yes.
> Q.  And it was his responsibility to make sure that every one of the Maintenance I
> workers had CDL licenses, right?
> A.  No, that was basically up to the office person, the timekeeper and so forth.  He
> was the one that kept the records of the licenses and supposedly checked them.
> Q.  Someone else was supposed to keep track of that and not Larry Matson?
> A.  Not necessarily Larry.  He might have kept track of it at some time, but that
> was not his responsibility.
> Q.  Had Mr. Witherspoon ever been disciplined prior to then for not having a
> CDL license?
> A.  No.
> Q.  By this memo, were you stating that if he didn't have a CDL license, he could
> not work?
> A.  We gave him 30 days to get it.  That's all.
> Q.  And if he didn't get it in 30 days, he wouldn't be able to work?

A. It was required to have it, yes. He had to get one.

Q. Sir, I'm asking you if he did not have it within those 30 days, would he not be allowed to work?

A. According to the work rules, yes.

Q. Now, during the entire time that you had been the director of public works, have you ever sent a memo out like this in terms of a CDL license?

A. No. When they first came in, we kept pretty good track of them and let them - - you know, they did it on work time, took the test and so forth if they didn't have it; but they were required to get it.

Q. So this was the first time that you had had the -- to send a memo out requesting that, correct?

A. Usually we did it in person, yes. That's the first memo because he was not in the facility.

(*Id.* 622-24.) We will only overturn the jury's verdict if the record shows that the jury was compelled to accept this explanation, instead of finding that on the evidence presented the requirement was enforced in retaliation. *Massey*, 226 F.3d at 924 (holding that overturning a jury verdict is not something the Court does lightly because "[a]ccording to our civil justice system, as enshrined in the Seventh Amendment to the Constitution, the jury is the body best equipped to judge the facts, weigh the evidence, determine credibility, and use its common sense to arrive at a reasoned decision.").

There is sufficient evidence in the record to enable a reasonable jury to reject defendant's explanation, including: (1) Johnston told plaintiff to obtain a CDL two weeks after he filed his EEOC charge when he had worked for defendant for five years without being told to obtain one; (2) it was not Matson's job to ensure that all employees have a CDL, but he was the one who noticed plaintiff did not have one; (3) Matson noticed that plaintiff did not have a CDL while reviewing plaintiff's grievance, though no reason has been offered for why Matson was doing so (especially since it seems that at the time he was reviewing it the meeting regarding the grievance had already taken place); and (4) Johnston only gave plaintiff thirty days to comply with the CDL requirement.

Because a reasonable jury could have found the testimony of both Johnston and Matson untruthful, they could have disbelieved defendant's given reason for requiring plaintiff to obtain a CDL, and instead inferred that it was in fact in retaliation for complaining. *See Weisbrot v. Med. Coll. of Wis.*, 79 F.3d 677, 681-82 (7th Cir. 1996) ("[I]mplicit in the [Supreme] Court's holding is the notion that, once the employee has cast doubt on the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury-not the court.") (citation omitted); *see also Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 633-34 (7th Cir. 1996) ("The defendants are off base in arguing that because the testimony of their officers . . . was not contradicted directly, the jury had to accept it. The jury may have thought them liars. It is the prerogative of a jury or other trier of fact to disbelieve uncontradicted testimony unless other evidence shows that the testimony must be true.") (quotation omitted). It was the jury's prerogative to disbelieve Johnston and Matson's testimony, and the Court will not question the jury's decision.

Because the Court has found that there was sufficient evidence in which a reasonable jury could have found that plaintiff was a victim of retaliation on one of the grounds presented, the Court need not address other ways the jury could have found for the plaintiff on his retaliation claim. The facts were put before the jury, and it was up to the jury to sort out which side's version was true. Here, the jury resolved the credibility questions and competing inferences in plaintiff's favor, and we have no reason to question the jury's assessment of the facts.

## Conclusion

For the reasons set forth above, the Court denies defendant's motion for judgment as a matter of law [doc. no. 187].  A ruling on the issue of back pay will follow.


SO ORDERED                    ENTER:  March 30, 2011

_____
        RONALD A. GUZMAN
        District Judge